Our final case of the morning is 117094, People of the State of Illinois v. Daniel Belknap. Ready to proceed? Ready? May it please the Court. Assistant Attorney General John Schleppenbach on behalf of the people of the State of Illinois. Your Honors, this Court should reverse the Appellate Court's decision and even state the jury's guilty verdict for two reasons. First, the Appellate Court failed to consider all of the evidence in context, and therefore wrongfully concluded that the evidence in this case was closely balanced for plain error purposes. And second, the Court expressly declined to consider whether the error alone likely influenced the verdict, and for that reason, again, found plain error erroneously. Turning first to the closeness of the evidence. Now, as this Court is well aware, the test of whether the evidence is closely balanced for plain error purposes is a common-sense, contextual analysis of all of the evidence presented by both sides, and it is a test that is not merely quantitative, but qualitative. This has always been the way the Court has articulated the test, and recently in People v. Adams in 2012 and People v. White in 2011, it really made this quite explicit, that this is a common-sense, contextual analysis. Now, the Appellate Court recognized the existence of those decisions and that they, quote, may indicate that a more contextual approach is warranted, end quote, but it still declined to follow that approach, quote, without more of a definitive statement from the Supreme Court in that regard, end quote. And that's paragraph 92, footnote 3 of that Court's opinion. So what the Appellate Court did instead was, in a single paragraph of analysis, it really focused primarily on evidence the State did not present. It said there's not physical evidence here, no eyewitnesses saw the defendant attack the victim, and as to the evidence that was presented, it really stated some generalities, that the evidence could be interpreted in many ways, that there was informant testimony in this case, and that that is a type of testimony that, as a general matter, is carefully scrutinized. However, the Court failed to then perform a careful scrutiny of that evidence to look at the... Can I ask this question? Yes. What is the Court to do? What did the Court fail to do? What would be the proper kind of analysis? The Court here went, marched through all the evidence, and then in a summary paragraph, we all write these paragraphs, so we understand how that works, in a summary paragraph, pulled these ideas together and made some conclusions. What more is required of a Court? Certainly. This Court can look to its own decisions for that, because what this Court has done in analyzing the balance of the evidence is the White decision from 2011 provides an excellent example. The Court did not merely recite the evidence and then say, oh, we think it's closely balanced. The Court took the witnesses, witness by witness, on both sides, and said this witness had a bias that we can discern from the record. This witness had a defect in his ability to perceive, and therefore, that is a quality, a qualitative analysis of the evidence that shows what its weaknesses were. We don't just rack up the evidence, count it down, and say quantitatively, there was a lot of evidence, but there was a lot of evidence on the other side. So it's a wash. We have to look at the quality. We have to analyze that. And that is what this Court has done. So it's the lack of analysis in the appellate court decision, is that what makes the difference here? Well, it's also the wrong result. I mean, this Court doesn't review analysis. It reviews results. And the wrong analysis is the way the Court reached the wrong result in this case. If you apply the proper test, if you look at all of the evidence in context, you can see that the evidence in this case was not closely balanced. Looking at things like whether the testimony was consistent, inconsistent, whether it was consistent with the theory of the case, something else this Court has done that the appellate court did not do. Taking the evidence just piece by piece for this Court, again, which the appellate court did not do, you can see the State presented the testimony of two witnesses who both testified that the defendant separately confided in them that he had attacked Sylvan Yocum when he had been awake for an extended period of time due to his methamphetamine use because he was concerned that she would inform the authorities about his drug use. That testimony was detailed. It included information like the victim's date of birth and the fact that the defendant owned a trampoline that really couldn't have been gotten from anywhere except from the defendant, and the witnesses testified consistently with each other, consistent with the physical evidence in this case about the manner of Sylvan Yocum's death and the injury she received, consistent with the victim's mother's testimony who was also the defendant's girlfriend, Erin Yocum, about the defendant's drug use and the times when the defendant had access to her, consistent with the defendant's unusual behavior following the discovery of the victim's injuries. So the Court could have ticked through those, and then it could have ticked through the other side of the argument, which it did do. These are suspicious, perhaps biased witnesses. And if the Court had laid all those pros and cons out, would that have met the standard of analysis that you think is required? Yes, if the Court had performed a thorough analysis of all the evidence, had looked at the things that made it believable or not believable, corroborated or contradicted, things that impacted the quality of the evidence, not just the quantity, then that would have been an appropriate application of the test, and we believe that a different result would have been reached in this case. It also should be considered in this case that it's a balance of the evidence. It's not just looking at the state's case, which is what the appellate court appears to have done, but also looking at all of the evidence in context. And what the defendant presented here was confusing and inconsistent, and really left the jury with no credible theory other than the people's theory. The defendant made the centerpiece of his defense the allegation that Erin Yocum, the victim's mother, had attacked her rather than him. But in his own testimony, the defendant categorically denied that that had left the jury with a confusion, something it could not resolve. It had no consistent theory from the defense. The theory that it had that was consistent and credible was the people's theory the defendant alone was responsible for Sylvan Yocum's injuries and for her death. Now, beyond just the closeness of the evidence – Let me ask you this. Yes. How do we review that decision? I'm sorry? Under what standard review would we review that decision, whether it's closely balanced or not? I believe it's de novo because it's an issue of law. And so the court incorrectly applied the law in this case and reached an incorrect result. The court also incorrectly expressly declined to look at whether the error in this case influenced the verdict. This court has said throughout the history of plain error that there are two types of plain error. You can look at the Heron decision from 2005 where it talks about there being these presumptively prejudicial errors, which are the structural errors, and then the errors of the type that we're talking about in this case, the errors where prejudice must be shown. And the court made this explicit in White in 2011 where it said that the test of whether the error influenced the verdict under plain error is the same as the Strickland prejudice analysis, which is familiar from the ineffective assistance context. And so this court well knows that when we're looking at prejudice, we're looking at not just the balance of the evidence, but also we're looking for some objective demonstration that there was a possibility this error influenced the verdict. We can't presume it. We can't merely speculate about it. We have to see some logical link between the error and the verdict. And this is important. The appellate court actually did presume prejudice. In its footnote 3, it again said it wasn't going to follow this court's rulings about prejudice because it found them uncertain. And it said we're just going to presume prejudice from the closest of the evidence. If that is the case, then we're mandating a perfect trial in every case where the evidence is closely balanced. Because no matter how small, how silly the error, if there is no prejudice component, then the closely balanced test would mandate a new trial. So if an attorney asking questions asks an improperly leading question early in the examination, no prejudice, but under the articulated version of the closely balanced test that the appellate court used and that defendant urges, that would warrant reversal. If the court left out a few words in reading a jury instruction, erroneous, not prejudicial, but under the defendant's reading, that wouldn't matter because he says that there is no prejudice component. Again, that's not how this court has always applied plain error. Looking again at Heron in 2005, the court found it relevant that the error alleged in that case pertained to something important, pertained to the eyewitness identification jury instruction. And in that case, the eyewitness identification was a crucial part of the evidence. Conversely, this court in cases like Peeble v. Williams from 1995 has said, hey, where the error relates to something that is not important, that is undisputed in the case, clearly that is not going to result in reversal, even under the closely balanced prong. There's no prejudice. How could a defendant then ever show that a Rule 431B error was sufficient to tip the balance? Well, there's a lot of different ways, Your Honor. If there were anything in the record, there were multiple colloquies about the Rule 431 principles, which as this court knows are the burden of proof, presumption of innocence. Multiple colloquies during voir dire at the outset of the trial and again in the jury instructions. There was never a point where the jurors, even during voir dire where they're invited to talk and respond to the court, never did a jury say, I don't understand that. Could you repeat that? Give me a moment. Anything of that kind. In fact, all of the jurors accepted the Rule 431 principles. They just were not separately asked whether they understood them. Another thing that a defendant might do is point to a lengthy deliberation from the jury saying, look, this was clearly a very close case. The jury was out for a day. The jury in this case was out for under two and a half hours. They did not view it as a hard case. They did not think that there was anything to be confused about. And that makes it very similar to this court's decision in Wilmington, which also dealt with Rule 431 error. And there the court said that there was no prejudice because, in part, there was no indication in the record that the jury at any time had reached an opinion that was considered as a close case. Do you think that there's a tension between Heron and White? Heron basically says the issue is closely balanced. The case is not cloaked with a presumption of prejudice. The error is actually prejudicial, not presumptively prejudicial. We deal with possibilities, not certainties. We deal with risks and threats to the defendant's rights. Where there is error in a close case, we choose to err on the side of fairness so as not to convict an innocent person. That's what we said in Heron. Yes, Your Honor. Have you moved away from that very strong statement? I think that the conflict is actually within Heron and is not between Heron and White because Heron, after all, also restates the prejudice component. Heron refers to this kind of error as prejudicial error and distinguishes it from prejudicial error, presumptively prejudicial error, which it says is the structural error. And Heron also says that the question becomes whether the defendant has shown prejudice at page 192. So it's not just presuming prejudice. It is looking for some indication of it in the record. So I do agree that there is conflict within Heron. There's a lot of different language in Heron. It was a decision that was really grappling with a lot of issues about plain error. And there's some language that may be inconsistent with White, but also inconsistent with itself. So this Court should really make those precedents consonant by following its subsequent decisions in White and Adams, which are indeed also consistent with Heron. Heron is the case that has a little bit of language that goes both ways. I would also note that this Court dealt with Rule 431 error in the Glasper matter in 2009. And it said that because there were jury instructions, as there were in this case three times,  presumption of innocence. You couldn't presume prejudice from the Rule 431 error. As the Court said in that case, to do so would require us to presume the citizens sworn as jurors ignore the law and the jury instructions given to them. This notion is contrary to our precedent, which instructs us to make the opposite presumption. So the prejudice should not be presumed. There must be some logical link, something in the record that leads us to believe there was prejudice that is absent in this case. And we would ask that this Court reverse for that reason. Turning briefly, if I could, to the merits of the cross-appeal, defendant has challenged the sufficiency of the evidence. The evidence in this case was sufficient for much the same reasons that it was not closely balanced. I would add that each of the elements of first degree murder was established here. Defendant's challenges to the evidence in both of his arguments really relate primarily to credibility. Those credibility issues are for the jury. The jury knew in this case that it was dealing with informant witnesses who had many convictions. There was a PowerPoint presented of the convictions. It knew that the witnesses had some issues that could potentially be problematic, but the jury apparently chose to believe those witnesses. The jury had the opportunity to gauge their demeanor, to gauge their responsiveness to questions and make that credibility determination. This Court isn't going to overturn that decision. This Court has said in People v. Manning that informant witness testimony, like any other witness, the credibility is a question for the jury. The Court won't overrule it. And similarly, the defendants asked for some inferences from the evidence to be made in his favor. That's not what the Court does on sufficiency review. The inferences are in the people's favor. And turning just briefly to the prosecutorial misconduct argument, that was not, there were no objections made at trial, as defendant concedes. So that's reviewable, if at all, for plain error. If this Court agrees that the evidence was not closely balanced, that then is the end of that argument. I would also add there was no prejudice from that alleged error either, because the jury was thoroughly instructed both that opening and closing statements are not evidence, and that it should not be moved by sympathy or prejudice. They're presumed to have understood and followed those instructions. Also, in terms of the arguments made, this is a far cry from those cases in which this Court has found plain error based on prosecutorial misconduct. Cases like People v. Blue, People v. Johnson, where you had what was termed a pervasive pattern of prosecutorial misconduct, where you had not just some off-color remarks or questionable remarks in closing, but also deliberate presentation of emotionally charged evidence that had no relevance. I think the memorable piece of that is that there was a blood-soaked police officer's uniform that was put on display during the trial, and that combined with the multiple forms of misconduct, including asking to send a message about crime, likening the defendant to an animal, and mischaracterizing the law in evidence. That altogether was the pervasive pattern of misconduct that was plain error and resulted in reversal. That is miles away from where we stand today. And so for that reason, we would ask that the cross-appeal also be rejected. If this Court is not comfortable resolving on plain error grounds, it could remand to the appellate court to consider that issue in the first instance. The appellate court resolved the case on other grounds and, therefore, didn't consider prosecutorial misconduct. The trial court obviously didn't reach the issue either, because there was no objection. So People v. Clendenin from 2010 says that that's an appropriate procedure for this Court to follow, if it so desires. But we would ask that this Court vacate or reverse the appellate court's decision and reinstate the jury verdict. Unless there are any questions, I will thank you for your time. Thank you. There are no questions at this time. Thank you. Mr. Boyd. Good day, Your Honors. Andy Boyd from the State Appellate Defender's Office on behalf of Defendant Daniel Belknap. If it please the Court and Counsel, I'd like to start with the issue that was raised previously, what more could the appellate court have done in this case? The answer, Your Honors, is nothing. If Your Honors take a look at the appellate court's decision in this case, the appellate court exhaustively analyzed these facts for approximately 70 paragraphs. To make a long story short here, Your Honor, the appellate court went over these facts page after page after page after page after page. Its analysis of these facts was exhaustive. It was fully engaged with the facts of this case for approximately 70 paragraphs. And the most important thing is when the court went on to determine that the evidence was closely balanced, the appellate court expressly stated, and this is in paragraph 91 of the opinion, based upon our thorough review of the evidence presented at trial in this case, we find that the evidence was, in fact, closely balanced. So we have an appellate court that thoroughly and exhaustively analyzed these facts page after page and then expressly stated that after reviewing this evidence exhaustively, it found that the evidence was closely balanced. So it is not clear what more the appellate court could have done, and it is not clear exactly what the state would have had the appellate court done. So to answer this court's question, the appellate court could not have done anything more in this case to analyze this evidence. Now, I'd like to take a step back and start with the state's initial arguments in Section 1 of their brief. Their first argument is that under plain error review, the first prong of plain error review, a review in court must undertake a common sense contextual analysis of the totality of the evidence in this case. And, Your Honors, we can see that that's the law. And this comes from the Heron case, it comes from White, it comes from Adams. We would agree that in this case, just as in every other case, when courts are deciding whether evidence is closely balanced, the court should take a look at the quality of the evidence. And to point this out, Your Honors, it's not entirely clear what a strictly quantitative analysis of the evidence would entail. I have not yet come across a case, and I'm not sure one exists, where courts, reviewing courts, simply take some sort of mathematical weighing of the evidence and add up, well, there's 47 pieces of evidence for the state, only 12 pieces of evidence for the defense, therefore the evidence is not closely balanced. In another case, the court might say, well, there's 50 pieces of evidence for the state and 49 pieces of evidence for the defendant, therefore the evidence is closely balanced. Reviewing courts simply don't do that. They have never done that. So, of course, what the reviewing court, this court should do in this case, is to take a common sense look at the quality of the evidence. And when this court does that, this court should find that the evidence is closely balanced. Now, one of the things that the state argues is that the appellate court didn't consider whether or not the Rule 431B error of prejudice the defendant. And what we have argued is that the appellate court did that. The appellate court, and a footnote that seems to have been the hinge for this entire case reaching this court, is the appellate court indicated that it had taken a look at the prejudice issue under the Heron case. And in that Heron case, this court wrote, in the first prong of the plain error rule, the defendant must prove prejudicial error. That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against them. This court went on to reiterate that in Kowsky. It also reiterated that in Adams and also in White. And so, yes, we will concede that in analyzing whether or not the evidence is closely balanced, we have to show prejudice by showing that it was closely balanced so that the evidence, so that the error could have tipped the scales of justice against the defendant. Now, the appellate court's citation to the Bessie case, which obviously is not binding on this matter of the court, but I do think it's constructive of the way the appellate court was thinking about this prejudice issue. The Bessie court said, well, White says, yes, that if we're alleging plain error and we're talking about whether evidence is closely balanced, we have to show prejudice. What that means, what that means is that we have to show that there was an error, number one, and number two, that the evidence was closely balanced. We do not have to take an additional step of making some kind of an objective showing of prejudice. And that's what the state seems to be urging in this case, that this honorable court take that additional step of requiring an objective showing of prejudice. And part of what we've argued is that what the state is asking here, frankly, is very dangerous. And this takes us back to this honorable court's statement in Heron that really is at the heart of this case. When there is error in a closed case, we choose to err on the side of fairness so as not to convict an innocent person. And what the state seems to be asking for here, Your Honors, is that we somehow flip this around so that when there's error in a closed case, we choose to err on the side of the prosecution so as to perhaps run the risk of convicting more innocent people. Respectfully to the state and this honorable court, what the state is asking here, frankly, is very dangerous because it leads us down a very dangerous path of perhaps taking the chance of convicting more innocent people. And in this case, what we've got is a very clear Rule 431B error. And what we're talking about in Rule 431B are these very essential principles of law that are designed by this honorable court to prevent having a biased jury. And so if we would say that we have to make an objective showing of that well, how in the world are we going to do that? And we tried to point this out in our initial briefing. And this is axiomatic. Everybody knows this, but juror deliberations are conducted in secret. Jurors are not under any obligation whatsoever to inform anybody about anything that happened in those deliberations. Now, there could be a situation, of course, where there's some kind of a note from a jury expressing some kind of confusion about a Rule 431B principle. There should be some kind of, perhaps, post-trial statement from a juror expressing confusion about a Rule 431B principle. We don't have that in this case, and we're not likely to have that in most cases. So what we have here is a case where we've got a Rule 431B error. We have evidence that on whichever standard this honorable court would like to take is closely balanced. And we have a problem with the Rule 431B principles. We don't know, Your Honors, whether the jurors understood, for example, that it was the state's burden to convict the defendant or whether the defendant was presumed innocent. Mr. Board, is there any significance that – I mean, it's an error, right? The jurors were not asked individually whether they understood the 431B principles. But as I understand the facts, each prospective panel was, right? The jurors in this case were asked whether they accepted these principles. They were not asked whether they understood them. None of the potential jurors were asked whether they understood these principles. So we don't know whether any of these jurors understood these principles. So the question was, do you accept the principles? And they all answered yes, right? Yes. And the phrases were something like, do you have a quarrel with or something along those lines. But essentially, yes, the trial court was asking the potential jurors whether they accepted these principles, yes. And the trial court neglected to ask these jurors whether they understood the principles. Yes. If they had, since they weren't asked individually, would there still be a 431B error claim, right, or not? I'm not sure I caught your question, Your Honor. Well, I thought, and I may have been mistaken, I thought that the 431B error, that the facts were that they weren't asked individually, even if they accepted the principles. They were asked individually, the jurors? The jurors were asked. Or was it more just to the panels with a nod of the head or that type of thing? Yes, I'm trying to recall, just for the record. My belief is that the jurors were asked in panels whether they understood, excuse me, whether they accepted these principles, but they were not asked whether they understood the principles. And so if they were not asked individually, they were asked in panels before. And the trial court's failure to ask was whether they understood those principles. That was the 431B error. Okay. I'd like to take a little bit of time talking about, and this really does get to the heart of this case, the question whether the evidence in this case was closely balanced. And what I'd like to point out is our argument is not only was this evidence closely balanced, this evidence wasn't sufficient to convict. The argument here is that this evidence was incredibly weak. All we have is the circumstantial evidence that places the defendant in the proximity of this horrendous crime. And we have two jailhouse informants, and there's no other way to put this nicely, who have a very strong incentive to testify falsely. And I have outlined a very familiar pattern, and this is in Mr. Garrett's book, Convicting the Innocent, of how these wrongful convictions occur when jailhouse informants are brought into the mix. And this happens over and over and over and over again. We have a murder case. A disproportionate amount of wrongful convictions occur in murder cases. Deceased victims, and this is obvious, cannot identify their attackers. Many times there's not any eyewitnesses to the crime. There's no physical evidence, just like there was no physical evidence in this case. And you have a defendant who won't confess. Well, how in the world are the authorities then going to get a conviction? The authorities turn to these jailhouse snitches. And this pattern repeats itself over and over and over again. We have jailhouse snitches who are incarcerated with the defendant, who have never met this defendant before they were incarcerated with them, and then testify that the defendant confessed to them. These jailhouse snitches will give high-minded motives for their testimony, and that's what happened here. Mr. Ahlers testified that he came forward because he was sorry that this young girl had missed Christmas. Mr. Burgess testifies that his conscience got to him. And then we have a situation where these jailhouse informants testify, well, we weren't offered any deal. And that's what at least one of these individuals testified to. And then we have the reward from the state. And both of these individuals were rewarded handsomely for their testimony. And the other thing to point out here, Your Honors, one of these individuals, Mr. Ahlers, was an admitted professional liar. He lies to people for a living. He had been accused and convicted of fraud county after county after county after county in the state of Illinois. That's what the man does for a living. He lies to people when it suits his own interests. And so this conviction would not have happened absent the testimony of these two individuals. What about the circumstantial evidence about the conduct of the defendant after the child was injured? Sure. And I understand that this was another thing that the state hung its hat on. The problem with that is that, and, again, with all due respect to the state, this is nothing more than sheer speculation and armchair psychology, Your Honor. The state did not present any expert testimony whatsoever that would indicate that criminal defendants behave in certain ways when they have actually committed the crimes as opposed to behaving in other ways when they've not committed crimes. We don't know how people behave in stressful situations. Even one of the state's witnesses, I believe it was one of the EMTs, testified that, in her experience, individuals reacted to stressful situations in many different ways. And it's just a matter of common sense that that's the case. So, yes, there was some circumstantial evidence that the state argued was indicative of Mr. Belknap's guilt. Our argument is that this evidence didn't prove anything. There's nothing in the record that indicates. When we're looking at the sufficiency of the evidence after trial, don't all the reasonable inferences run with the state? Yes, they do. Yes, and we will concede that our sufficiency of the evidence argument is a tougher argument than our closely balanced evidence argument. There's no way around that. But we could look at the Rivera case, and I think the Rivera case cited this honorable court's decision in Herman's that said something like, when we have jailhouse informants who are testifying with an idea of reward, and that certainly was the case in this case, then their testimony shouldn't be accepted unless it carries with it an absolute conviction of its truth. And I would respectfully submit that that cannot be the case in this case. This honorable court does not have to believe that the testimony is, and I certainly will concede that there's a number of different cases that say that the credibility of witnesses, including jailhouse informants, is an issue for the finer of fact. There's no way around that. But this honorable court has said in the Herman's case that reviewing courts need not accept that sort of testimony in cases where there is no absolute conviction of the truth. And again, with all due respect to the state, this is how wrongful convictions happen. It happens over and over and over and over again, Your Honor. There's no other evidence convicting a defendant to a crime. The only testimony we have directly connecting a defendant to a crime is the testimony of jailhouse snitches. Reviewing courts say, well, the issue of the credibility of jailhouse informants is for the prior of fact, and the conviction is affirmed. Twenty years later, there's a DNA test, and the defendant is set free. This happens repeatedly. Whether or not it happened in this case, I don't know. But I certainly would urge Your Honors to take a look at Mr. Burgess and Mr. Owler's testimony with a very, very, very skeptical eye. I would like to talk about, very briefly, one of the state's arguments about whether there is a de minimis exception to the plain error rule. And the state cited the White case in support of that assertion. And I think there's a couple different ways for us to respond to that. The first would be that White and the Instant Case are different for a couple different reasons. First of all, White was a bench trial. This was a jury trial. And because White was a bench trial, we had the court's reasons for its convictions in the record. Maybe more importantly, however, the error in White, the alleged error in White, was an evidentiary error. Whether or not testimony relating to a lineup should have been admitted. And what the White court found was that, well, in that case, because the rest of the evidence was so overwhelming, the evidence of this lineup wasn't so important, regardless of whether it should have been let in or not let in. So the effect of that piece of evidence was de minimis. What this court did not find in White, and I want to underline this, was that there was a general de minimis exception to the plain error rule. In this case, we have something very different from a minor evidentiary issue. These are the 431B principles. The importance of which this court has recognized going all the way back to the Zaire decision, I believe, which was in 1984. It was in Zaire where this Honorable Court recognized how important these principles were. And then this court went so far as to codify those Zaire principles in Rule 431B a few years later. And at that time, when this court initially codified those rules, it stated that, well, courts should ask those questions if the defense requested it. Later on, this court went on to amend that rule to say that the court shall ask these questions. So this Honorable Court has recognized over a period of years the increasing importance of these Zaire principles. So for the defense, respectfully, for the state to argue that these principles are de minimis simply doesn't hold water. And I see that my time is running out. I'd like to very briefly talk about our cross-appeal. And we've talked some about the insufficiency of the evidence. I'd like to emphasize again how weak the state's evidence was in this case. This conviction would not have happened without these jailhouse informants. And it's clear that this Honorable Court does not have to blindly accept the testimony of these jailhouse informants. And very briefly, I'd like to talk about the improper remarks by the prosecutor. The prosecutor said three times in opening statement, three times in closing arguments, the prosecutor directed the jury's attention away from the elements of crime and tried to engender sympathy for the young victim of this crime. And this is absolutely amazing to me. In the closing argument, the prosecutor said to the jury, I shouldn't be doing this. I know that I shouldn't be doing this. And he went ahead and he did it anyways. My gosh, what in the world could be more prejudicial than that? You have a prosecutor who knows darn well that he's not supposed to do what he's doing. He tells the jury he's not supposed to be doing what he's doing, and he goes ahead and he does it anyways. That pretty clearly is prejudicial. And what I would suggest, Your Honors, if this Court were to find that the evidence was closely balanced but didn't find prejudice in the Rule 431B error, the Court could find prejudice in the prosecutor's improper remarks. So I'd like to wrap up very briefly by saying that we would first ask for this Honorable Court to find that the evidence in this case was insufficient to convict. If this Honorable Court would decline our invitation there, we would respectfully request that this Honorable Court remand this case for a new trial based on either or both of the Rule 431B issues and the prosecutorial misconduct issue. I do have some time left. If there's any other questions, I'll be happy to hear them. I just wanted to ask one question. What's the relevance of the trial evidence when we're trying to determine the error occurred during voir dire? And if the jury itself was impartial? What's the relevance of the trial evidence? I think that's a fair question. I think the relevance of the trial evidence is simply because that is the standard that we use to determine whether the evidence is closely balanced. We have a clear error, and we have evidence that either is or is not closely balanced. And if the evidence is closely balanced, then we should have a reversal for a new trial. Now, I guess I could also say, and I see I'm out of time, I'll very quickly wrap up. If we don't know whether the jurors understood these principles because they weren't asked, if we had a juror who didn't understand the defendant was presumed innocent and we had evidence that was extraordinarily closely balanced, it's entirely possible that that could be incredibly prejudicial to the defendant. So that's where the closeness of the evidence comes in, in my view. Thank you for your time. Thank you. Just a few quick points on rebuttal, Your Honors. The defendant asserts that they've accepted the prejudice requirement for the closely balanced prong, but then continues to ask this court to do as the appellate court did and infer prejudice merely from the closeness of the evidence. Again, that's not what this court has traditionally held, how it's articulated the test. It hasn't asked only whether the evidence was closely balanced, but whether it was closely balanced such that the error alone likely tipped the scales of justice against the defendant. That's what it should ask here, and the answer to that question is no. This court, essentially the defendant is asking this court by presuming prejudice from the closely balanced analysis and finding Rule 431 error and reversing, it's essentially asking for a category of error that lies between structural error and this closely balanced error. And this court has declined to do that. This court has looked at Rule 431 in the past, in Glasper, in Wilmington, and it is said that it is error, but it is not structural error. It should abide by that decision and not presume prejudice from the error in this case. And again, there's good reason to believe that there wasn't prejudice here, because the jurors were instructed on these principles. They are presumed to have understood those instructions. The defendant actually highlights it nicely that the concern that animates Rule 431 is a biased jury. And we know we didn't have a biased jury here, because all of the jurors accepted the Rule 431 principles. There was, among them, no one who said, I'm going to nullify. I don't agree with that. I think that the defendant should have to prove he didn't do it. They accepted the principles. So there was no concern that they were biased against them. The question that wasn't asked was about understanding, again, that was error, but it wasn't prejudicial error, and under Wilmington, this court should not presume the prejudice. As to the informant testimony, there have been an endless array of challenges raised to the use of informant testimony. But this court has never held that informant testimony is per se unbelievable and should be discounted. In fact, it's held the opposite, that credibility questions, even with informants, remain questions for the jury. And in this case, all of those issues were fleshed out before the jury. The jury had the opportunity to assess that, in addition to assessing the witness's demeanor in person and the way they presented their testimony. And apparently, the jury found these witnesses credible. As finally, as to defendant's contention, that his unusual behavior following the victim's death is just manifestation of the fact that people react to stressful situations differently. Stress generally does not make people go to their friends and ask them on two different occasions of the day that their girlfriend's daughter is taken to the hospital whether they should be concerned that the police are coming after them. That's not normally the first thing on a person's mind in a situation of grief. It does not cause people to avoid the police for months at a time and to tell their girlfriends to please do the same thing, lie to the police, tell them your car broke down and you couldn't make the interview, change your phone number, and don't talk to them anymore. That is not part of the normal grieving process. That is conduct that is indicative of an understanding of guilt, and this court can and should consider that in its closely balanced analysis. So for those reasons, we'd ask that you reverse the appellate court's decision. Thank you. Thank you. Case number 117094, People of the State of Illinois v. Daniel Belknap, will be taken under advisement as agenda number eight. Mr. Schleppenbach, Mr. Boyd, we thank you for your arguments today. That concludes our oral argument schedule for today. The court stands adjourned until tomorrow morning at 9 a.m.